IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:11-cr-11 |
| | ) | |
| -vs- | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER DENYING DEFENDANT'S** |
| Benjamin Joseph Hager, | ) | **MOTION TO SUPPRESS** |
| | ) | |
| Defendant. | ) | |

## I. INTRODUCTION

Before the Court is Defendant Benjamin Joseph Hager's (hereafter "Hager") motion to

suppress the search of 747 VHS videotapes lawfully seized from his residence on November 24,

2010 (Doc. #35). The motion seeks to suppress any evidence obtained from or discovered during

a review of the tapes by agents of the Department of Homeland Security. Also before the Court is

Hager's alternative request that the Court conduct a hearing under Franks v. Delaware, 438 U.S.

154 (1978).

The matter came regularly on for a hearing on July 19, 2011. The Court allowed

supplemental briefs to be filed based on evidence presented at the hearing (Docs. #51, 52).

Having carefully considered the evidence and the arguments of the parties, the Court now issues

this memorandum opinion and order.

## II. SUMMARY OF ARGUMENTS AND HOLDING

Hager believes: (1) the warrant that authorized the seizure did not authorize the viewing

of the tapes and that it could not have authorized viewing consistent with the United States

Constitution's probable cause requirement; (2) viewing the VHS tapes exceeded the scope of the

underlying warrant; and (3) a warrant obtained after a partial view of the VHS tapes is fruit of the

poisonous tree and must be suppressed. The United States disagrees, arguing that the November 23, 2010 warrant that led to the November 24 seizure authorized the viewing of the seized tapes, and that as a result the second warrant was entirely appropriate. The United States further argues that even if the warrant was improvidently granted or officers exceeded the scope of the warrant, they conducted themselves at all times in a manner that falls within the good faith exception of United States v. Leon, 468 U.S. 897 (1984).

With regard to the related request for a hearing under Franks v. Delaware, 438 U.S. 154 (1978), Hager claims that the affidavit underlying the search warrant in question was materially false and that the falsehood was a deliberate or reckless one. More specifically, Hager contends the agents needed to advise the magistrate judge that they already had access to metadata from numerous image files that Mueller emailed to Hager, and that they knew or should have known that no metadata would be located in Hager's apartment because they were aware Hager accessed the Internet through WebTV. The United States denies that a Franks hearing is required under the facts present in this case because it believes that the search warrant application was not on the whole misleading, that any lack of precision was neither deliberate nor reckless, and that the warrant was fully supported by probable cause even disregarding the misstatement in the affidavit.

The Court finds that the warrant executed on November 24, 2010 extended to the 747 VHS tapes, was supported by full probable cause, and was not based on any intentional or reckless misstatement; therefore, Hager's motions are **DENIED**.

### III. STATEMENT OF FACTS

In September of 2010, Timothy Litzinger, a Special Agent with the directorate ICE

Homeland Security Investigations (hereafter "HSI"), was contacted by HSI agents from

Michigan. The Michigan agents informed Special Agent Litzinger that they were engaged in a

child pornography investigation of Robert J. Mueller who resided in Sterling Heights, a suburb of

Detroit, Michigan. (Doc. #48, Transcript of Suppression Hearing held on July 19, 2011, p. 76

(hereafter "Tr.")). Special Agent Litzinger was told by the Michigan HSI agents that on July 6,

2010, they had executed a search warrant at Mueller's residence and discovered images of more

than one adult male sexually assaulting Mueller's four minor daughters. Tr. 59-60; Doc. #1, Case

No. 3:10-mj-144, United States v. 716 6th St. S., Apt. #7, Wahpeton, ND 58075 (D.N.D.),

Affidavit of Timothy Litzinger in support of November 23, 2010 search warrant ¶ 15 (hereafter

"Search Warrant Aff. 1").

During the Michigan search, the agents found a lock box which contained a pair of soiled

little girl's panties wrapped in clear plastic and accompanied by a note from an individual named

"Ace" which stated:

> Hey bro, well I sprayed a bunch of loads in these for ya, just like ya wanted, lol.
> (You can see plenty of yellow cum stains if you look inside the panties).
> Definitely had lots of fun doing it too. Can't wait to do it lots more for ya in the
> future too, hehe. Talk to ya later. Ace.

Search Warrant Aff. 1 ¶ 16.

Mueller admitted to the officers that he had been producing child pornography depicting

his daughters, that he had shared this information with others online, and that he had sought out

other people who had a similar sexual interest in young girls through internet online chat forums.

Id. at ¶ 17. Mueller also confessed that he had traded child pornography with people he had

come to trust but that rather than sending the images by email he used Bitwise, an encrypted

peer-to-peer program.  Id.  The HSI agents seized Mueller's electronic media and a later search of

the computer revealed a photograph of a package, marked "Handle with Care" revealing a return

address of "Ben Hager, 716 - 6ᵗʰ St S., Apt. # 7, Wahpeton, ND 58075."  Id. at ¶ 19.

Michigan HSI further reported that they had discovered emails showing that a person

using the email address "CujoBen@webtv.net" had a sexual interest in children and that he

referred to himself as "Ace."  Id. at ¶ 24.  The "CujoBen" account was also found to be registered

to Ben Hager at the same Wahpeton address. Id. at ¶ 26.

As a result of this information, HSI Special Agent Shane Conroy of the Grand Forks,

North Dakota office conducted some surveillance and investigation and discovered that

Benjamin Hager and his young daughter lived at the residence listed on the return address, and

that only Hager and his minor daughter receive mail at the Wahpeton address.  Id. at ¶ 20.

On September 20, 2010, Special Agent Litzinger received a CD from Michigan HSI,

which included numerous explicit emails in which CujoBen admitted to having a sexual interest

in little girls and their feet.  Id. at ¶¶ 31 - 52.  Special Agent Litzinger was also informed that

Mueller had been indicted on August 5, 2010, and faced one count of conspiracy to produce child

pornography, five counts of production of child pornography, one count of transportation of child

pornography, one count of distribution of child pornography, one count of receipt of child

pornography, and two counts of possession of child pornography.  The case was scheduled for

trial on November 30, 2010.  Id. at ¶ 54.

Michigan HSI had also, at some point, reported to Special Agent Litzinger that a search

conducted of Mueller's Yahoo email account uncovered a series of sexually suggestive emails

between Mueller and Hager, and that some of the emails included non-pornographic pictures of

Mueller's daughters.  Id. at ¶¶ 31 - 52.  It is undisputed that while some of the images seized

from Yahoo contained EXIF-metadata[1] (hereafter "metadata") at least one of the Yahoo

thumbnail images sent to Hager did not contain the metadata. Tr. 61.

It is undisputed that the contacts from the Michigan HSI agents were essentially a "person

of interest" disclosure to North Dakota HSI agents – that is, simply a report that the Michigan

HSI agents had discovered that Hager was involved in sexually explicit conversations with a

known child offender, that there had been a transfer of non-pornographic sexually suggestive

photos of the minor victims, and that soiled little girl panties had apparently been sent by Hager

to Mueller.  It is also undisputed that Michigan HSI never specifically asked the North Dakota

agents to conduct any investigation in North Dakota to aid their investigation.  Tr. 77.

After receipt of the Michigan information, North Dakota HSI conducted a further

investigation of Hager and discovered that he had at least two prior law enforcement contacts as a

result of his interest in young girls.  In February 2000, Hager admitted to law enforcement that he

had sent $100 to Russia in the hopes of accessing a teen sex website but that he had received

"nothing" back and that "I refuse to pay the credit card bill until I get this."  Search Warrant Aff.

1 at ¶¶ 59-60.  The Wahpeton, North Dakota police department also reported that they had

received a complaint about Hager in April 2009.  Id. at ¶ 61.  A person calling himself Benji

Hager had been engaged in "creepy" conversations online with KP, a minor from Watertown,

South Dakota, and that "Benji Hager" seemed to be obsessed with her feet.  Id. at ¶¶ 62-98.  The

---

[1] EXIF-metadata is underlying data that is attached to a file that provides identifying information about the file.  It includes such information as (1) when the data file was produced; (2) when it was last modified; (3) the type of device used to create it; (4) the brand or model of a digital camera that was used to create it; and (5) the program or firmware used to create the file. Tr. 16-17.  While it can identify a brand and model of camera it does not identify a specific unique camera or serial number of a camera.  Tr. 17.

online chats between KP and "Benji Hager", as quoted in the November 23, 2010 search warrant affidavit, appear to be fairly described as "grooming" in nature and appear to be increasingly suggestive in nature. Hager had also told KP that he was a "rock 'n' roller" and that his favorite band was KISS. Id. at ¶¶ 75, 85. Ace Frehley was the lead guitarist of KISS during its most successful years. http://www.kissonline.com/history/.

After discovering this information, Special Agent Litzinger contacted the Michigan HSI agents and informed them that he intended to seek a search warrant of Benjamin Hager's residence. Tr. 79. He told them he intended to search for copies of the images of Mueller's daughters in Hager's possession and was going to look for metadata to provide them additional information for their case. Id. When informed of this decision, the Michigan HSI officers indicated that they would find the information helpful and thanked Special Agent Litzinger for his help. Id. at 78-79.

On November 23, 2010 Special Agent Litzinger applied for a search warrant to allow agents to search Hager's apartment for "contraband, fruits of a crime, or other items illegally possessed." In the Matter of the Search of 716 6th St. S., Apt. #7, Wahpeton, ND 58075, 3:10-mj-144, Doc. #1. United States Magistrate Judge Karen K. Klein reviewed the warrant application and issued a warrant authorizing the search of the apartment. Id., Doc. #2. Attachment B described with specificity the items that could be seized, which included "tapes." Id.

On November 24, 2010, a search was conducted by Special Agent Litzinger accompanied by two other HSI agents, two special agents of the North Dakota Bureau of Criminal Investigations, and three Wahpeton police officers. Tr. 37. Special Agent Litzinger testified that

they were looking for images of Mueller's daughters in Hager's possession. Id. at 36. When the

agents arrived at Hager's apartment, they isolated Hager and informed him of the following: (1)

they had a warrant to search his apartment, and (2) they did not intend to arrest him at that time.

The agents then asked Hager if he wanted to talk. Hager said he did not want to talk.[2] Id. at 38-

39. The record is undisputed that Hager kept asking questions of HSI agents Conroy and Arel

and they both informed Hager that they could not speak to him because he had asked to speak to

a lawyer. (Doc. #45-2, Report of Investigation). In response to these admonitions, Hager stated

that since he was not going to be arrested or taken to jail he wanted to talk to the agents. Id. At

that point, Special Agents Arel and Conroy made it clear to Hager that he was not under arrest

and that he was under no obligation to speak to them. Hager said he understood and wanted to

talk. Id. Hager initiated these conversations and understood that he had a right to refuse to speak

without a lawyer present. Id. The Court finds that even if Hager initially invoked his right to

counsel at the time of the search, he subsequently waived the right to have a lawyer present when

he knowingly and voluntarily initiated conversation with the agents.

Hager admitted he knew Mueller. He also acknowledged coming into contact with

Mueller in an online chat forum for men who liked younger girls. Hager and Mueller shared an

interest in young girls. Tr. 46. Hager admitted he was aware that Mueller had been molesting

---

[2] There is some question as to whether or not Hager actually invoked his right to counsel, as the government's own agents apparently disagree as to exactly what was said. It is not disputed that Hager originally stated he did not want to talk. Nor is it disputed that Hager continued to talk after he said this. It is also undisputed that even if Hager asserted his right to counsel, he later waived the assertion and voluntarily began talking. While it appears Hager's counsel denies a waiver, there is no evidence in the record to refute that Hager initiated the subsequent conversation after being reminded that he had previously asserted his right to counsel and that the officers could not talk to him without a waiver of his right to counsel. Hager affirmatively stated that he knew he had a right to have a lawyer present, that he knew he had no obligation to talk to counsel, and that he nonetheless wanted to talk. Given the state of this record, it is undisputable that a knowing and voluntary waiver of the right to counsel was made. United States v. Hyles, 479 F.3d 958, 966 (8th Cir. 2007) (finding no violation of the right to counsel, when a defendant, even if previously invoking the right to counsel, voluntarily initiates a conversation with officers).

his children and that he had received non-pornographic pictures of the minor daughters. Hager

described the images in a manner that was essentially identical to the images that had been

provided by the Michigan HSI officers. Id. Hager also reported that he knew which images were

"legal" and that he only sought legal images of children. Id. at 47. He denied possessing any

child pornography. Id. Hager told the agents that he used the WebTV connection to copy

information on the internet to VHS tapes. Id. at 48.

While searching the apartment, the officers discovered 747 videotapes capable of holding

more than 4,400 hours of information viewed on the television. Special Agent Litzinger called a

HSI forensics expert in Grand Forks to ask him if the VHS tapes constituted "electronic media."

Id. at 48-49. The forensics expert assured Special Agent Litzinger that they did. Id. at 49. After

receiving this assurance, Special Agent Litzinger called First Assistant United States Attorney

Lynn Jordheim and asked him if the VHS tapes were covered by the warrant. He was assured by

AUSA Jordheim that the tapes were within the scope of the warrant. Id. The tapes were seized

during the search. Neither the WebTV access box nor the VHS recorder were seized in

connection with the warrant.

Special Agent Litzinger admits that he was unfamiliar with WebTV before this case; that

he thought it was similar to a modem; and that he had no idea of how VHS recording devices

actually worked before this case. When he seized the tapes, he believed he would find the

Mueller images on them. Id. at 50. He also believed the videotape images would contain

metadata useful to the Michigan case. Id. at 50-51. Special Agent Litzinger admits it never

occurred to him that VHS tapes were analog tapes and that they would not contain metadata. Id.

at 52. Special Agent Litzinger noticed a USB port on the WebTV box and assumed that

whatever information was on the videotape was essentially the same as if it had been stored to a computer media.  Id.  at 55-57.

Once the tapes were taken to HSI offices in Grand Forks, Special Agent Litzinger and a support staff member, criminal research specialist Devon Stefanowicz, reviewed the tapes on a standard VHS player.  Id. at 52-54.  Neither Litzinger nor Stefanowicz is a forensic expert.  They did not understand that no metadata could be contained on a VHS tape.  Id.  It is undisputable that metadata is not found on VHS recordings, as such recordings are analog and by definition metadata is digital.  Tr. 15-27.  It is also undisputable that any reasonably competent forensic computer scientist would know that metadata cannot be stored on analog tape.  Id. at 25.

When Special Agent Litzinger and Stefanowicz viewed the VHS tapes, they discovered images of what appeared to be child pornography.  Upon this discovery, they stopped viewing the tapes and sought an additional warrant.  In the Matter of the Search of 747 VHS tapes seized from 716 6th St. S. #7, Wahpeton, ND held in the custody of the HSI RAC Grand Forks, ND, office located at 1209 N 47th St. Grand Forks, ND, Doc. #1, p. 5.   A warrant to search the tapes for evidence of child pornography was issued by United States Magistrate Judge Karen K. Klein on December 20, 2010. Id. at Doc. # 2.

Hager moves to suppress the evidence seized on November 24, 2010, because the search exceeded the scope of the warrant, or in the alternative, the warrant lacked probable cause in violation of the Fourth Amendment to the United States Constitution.  He also contends that the search does not fall into the good faith exception established in United States v. Leon, 468 U.S. 897 (1984).  Finally, Hager seeks a Franks hearing on the ground that the original warrant application did not include relevant information, and that the withholding of the information was

either intentionally or recklessly misleading.

## IV. DISCUSSION

### A.       Motion to Suppress

Under the Fourth Amendment, a search warrant is valid as long as it is supported by probable cause. United States v. Carpenter, 422 F.3d 738, 744 (8th Cir. 2005). Probable cause is determined by examining the "totality of the circumstances." Id. If the circumstances demonstrate sufficient facts to "create a fair probability that evidence of a crime will be found in the place to be searched" then there is probable cause to support the warrant. Id. (quoting United States v. Gabrio, 295 F.3d 880, 883 (8th Cir. 2002)).

When employing a totality of the circumstances test, courts are to use a common-sense approach rather than a hyper-technical one. United States v. Carter, 413 F.3d 712, 714 (8th Cir. 2005). The proper standard is whether an affidavit sets forth sufficient facts to establish a "fair probability" that contraband or evidence of criminal activity will be found, which is not a certainty or even a preponderance of the evidence. Illinois v. Gates, 462 U.S. 213, 238 (1983). Investigators need not suspect the actual owner or occupant of a residence of a crime if there is probable cause to suspect the items to be seized are located on the property. Zurcher v. Standford Daily, 436 U.S. 547, 556 (1978). When search warrants are for evidence of the crimes of others, a probable cause evaluation includes consideration of law enforcement's purpose for obtaining the warrant. Warden v. Hayden, 387 U.S. 294, 307 (1967).

The warrant issued on November 23, 2010, sought to obtain images of Mueller's daughters sent by Mueller to Hager. The warrant application describes the images as sexually suggestive, a description Hager rejects. Even so, it is plain from the facts related to the

10

magistrate judge, that the pictures certainly had some sort of erotic appeal to both Mueller and "CujoBen." The descriptions of the photographs of the minor victims were described luridly by both parties to the known email discussions.

While much has been made about the reference to EXIF-metadata in the supporting warrant affidavit and application, it is plain that neither the application nor the warrant itself limits application to files that could contain metadata. The warrant more broadly includes evidence of crimes committed by Mueller. The warrant authorized the agents to search and seize a broad array of media in order to locate the images of Mueller's daughters "wherever they may be stored or found, including but not limited to:

I.        any computer, computer system and related peripherals; tapes, cassettes, . . . ."
(Search Warrant Aff. 1, Att. B).

Hager also claims there was no basis in the warrant application for a neutral magistrate to find probable cause that other evidence of Mueller's criminal conduct might be in the Wahpeton residence. This reading is selective in the extreme. A fair review of the warrant application and the supporting affidavit indicates that Benjamin Hager had more than a passing knowledge of Mueller's criminality. The note and the purportedly semen-stained panties reflect a relationship between Mueller and Hager that went beyond merely exchanging emails.

Also, by the time the warrant was sought, Mueller had already admitted to the authorities that he had exchanged photographs of the rape of his own daughters over a peer-to-peer network with other men who were similarly interested in young girls. The depravity of the descriptions offered by "CujoBen" of the supposedly innocent photographs of those same young girls demonstrated a marked deviance toward young girls. There was full probable cause to believe

that "CujoBen" might well be in possession of contraband that could be significant evidence that

would be useful in the Mueller trial.  On top of this, the HSI produced evidence that Hager had

been in inappropriate computer based contact with a minor child in 2009.  The conversations

between Hager and Mueller as well as Hager and KP involved a "little girl foot fetish."

Hager makes much of the fact that Special Agent Litzinger expected to find evidence of

other crimes during the course of the search.  The test in this case is not whether the officers

expected to find evidence of other crimes by Hager; rather, it is whether or not they had probable

cause to believe that they would find evidence that would be useful in prosecuting Mueller.

United States v. Olson, 21 F.3d 847, 849 (8th Cir. 1994) (reviewing court's task is to determine

if, based on the totality of the circumstances, there is a fair probability that contraband or

evidence of a crime will be found in a particular place).

Any fair-minded person reading the warrant application would have concluded that HSI

had that probable cause.  They had probable cause to believe they would find photographs with

embedded metadata that would be useful in prosecuting Mueller.  Given the nature of the

relationship between Hager and Mueller, they would also conclude that there was full probable

cause to believe that other photographs tying Mueller to distribution of child pornography were

likely to be found in Hager's possession.[3]

Even if Hager were correct in his belief that the warrant was limited to metadata, his

motion would still fail.  Other than trial lawyers, forensic specialists, and IT professionals, few

---

[3] The fact that no such photographs were found is irrelevant to this discussion.  The test is not if contraband is present but if the circumstances demonstrate sufficient facts to "create a fair probability that evidence of a crime will be found in the place to be searched" then there is probable cause to support the warrant." Carpenter, 422 F. 3d at 744.

people could define what metadata is and where it could be found. While Special Agent

Litzinger took classes related to child pornography investigations that discussed metadata, it is

highly unlikely that any of those classes discussed the nature of VHS tapes and how the recording

system works. The Court suspects that VHS tapes are discussed at training sessions for modern

investigations about as frequently as the Rule in Queen Anne's case is discussed in Continuing

Legal Education sessions for lawyers – and for the same reason: they are both largely irrelevant

in today's legal world.

It is credible that Special Agent Litzinger expected to find metadata on the VHS tapes.

His calls to Craig Williams, the forensic scientist, and Lynn Jordheim, First Assistant United

States Attorney for the District of North Dakota, further establish prudence and good faith. Even

if Hager's strained reading of the warrant were applied, the evidence would still be admissible

under the good faith exception to the exclusionary rule. See United States v. Leon, 468 U.S. 897

(1984). Under Leon, evidence obtained pursuant to an invalid search warrant is not barred unless

the magistrate judge issuing the warrant "abandoned his or her neutral and detached role in

issuing it" or the officers preparing the affidavit were dishonest or reckless and could not have

harbored an objectively reasonable belief in the existence of probable cause. United States v.

Tellez, 217 F.3d 547, 550 (8th Cir. 2000). In this case, there is no indication that the magistrate

abandoned her neutral and detached role in issuing the warrant, nor has Hager made this

contention. Although Hager contends the affidavit supporting the warrant application contained

misleading information, the officers were not dishonest or reckless in preparing the affidavit for

reasons more fully explained in the next section. It was objectively reasonable for Special Agent

Litzinger to rely on the assurances of Williams, a forensic scientist, or the First Assistant United

States Attorney, that the tapes were covered by the warrant.

The search was both authorized by the warrant and falls well within the good faith exception in Leon.

### 2. Request for a Franks Hearing

Hager also claims that because Special Agent Litzinger failed to disclose that the Michigan HSI agents already had some of the metadata for the Mueller photographs, the affidavit is either intentionally or recklessly materially false and he should be afforded hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978). Not every misstatement is intentionally or recklessly false. See United States v. Ryan, 293 F. 3d 1059, 1061 (8th Cir. 2002). A court must consider the circumstances as a whole. Likewise, the warrant application and the affidavits supporting it must be read "with common sense and not in a grudging, hyper technical fashion." United States v. Goodson, 165 F.3d 610,615 (8th Cir. 1999)(citations and quotations omitted).

Special Agent Litzinger apparently had some information in his possession that some of the metadata was actually in the possession of the HSI agents in Michigan. He also was truthful in stating that the metadata would be helpful in prosecuting Mueller. Hager's argument that Special Agent Litzinger failed to inform the magistrate judge that he was only looking for "some" metadata rather than "all" of the metadata is a tempest in a teapot.

Franks requires that the misstatements were essential to the warrant – that is, if the facts were known to the neutral magistrate, no warrant would issue. Ryan 293 F.3d at 1061. The "suppressed fact" that Michigan HSI agents already had "some of the metadata" would not have changed the legal analysis at all. This is particularly true when, as here, the warrant was not

limited to a search of metadata alone. In light of these conclusions, a hearing under <u>Franks v. Delaware</u> is not required.

## V. CONCLUSION

The Court finds the search of the VHS tapes was authorized by the warrant. Furthermore, even if it was not, it falls within the good faith exception set forth in <u>United States v. Leon</u>, 468 U.S. 897 (1984). Finally, the failure to notify the magistrate judge that the agents already had metadata from some of the images found in Mueller's residence would not change the probable cause finding, particularly when the warrant was not limited to a search for metadata.

For the foregoing reasons, Hager's motion to suppress, and in the alternative, motion for a <u>Franks</u> hearing is **DENIED**.

**IT IS SO ORDERED**.

Dated this 31st day of August, 2011.

/s/ Ralph R. Erickson
Ralph R. Erickson, District Judge
United States District Court
